**UNITED STATES of America,**
Appellant,

v.

**R. T. and Gertrude WOOLSEY et al.,**
Appellees.

No. 20427.

United States Court of Appeals
Fifth Circuit.

Dec. 18, 1963.

Rehearing Denied March 3, 1964.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Woodrow B. Seals, U. S. Atty., Houston, Tex., Michael Smith, David O. Walter, Attys., Dept. of Justice, Washington, D. C., John H. Baumgarten, Asst. U. S. Atty., for appellant.

John G. Heard, Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for appellees.

Before HUTCHESON and GEWIN, Circuit Judges, and HOOPER, District Judge.

GEWIN, Circuit Judge.

This case involves Federal income taxes for the years 1955 through 1959. The Government has appealed from a final judgment of the U. S. District Court for the Southern District of Texas in favor of the taxpayers. The question presented is whether the amounts received by the taxpayers in consideration for the sale of their rights and interests in their partnership business which owned a

management contract with a mutual insurance company are taxable as ordinary income or as a long term capital gain. The sale involved a total consideration of $171,500.00. Many of the facts were stipulated and other facts were developed by testimony. There is no dispute as to the facts found by the trial court.

The taxpayers, R. T. Woolsey[1] and V. G. Woolsey, were engaged in the management of mutual insurance companies for over 25 years. The management contract here involved existed between the taxpayers and Gulf Security Life Insurance Company, a mutual company. The taxpayers contend that the total consideration involved should be taxed as a long term capital gain, and the trial court so held. The management activities of the taxpayers were conducted as a partnership, also called Gulf Security Life Insurance Co., in which each of the brothers owned a 50% interest.

By the terms of the contract, 40% of all premiums were paid into a fund designated the "general fund", and delivered to the taxpayers. From this fund the taxpayers were required to pay all of the operating expenses of the company and any balance remaining was retained as a fee or compensation for managerial services. The management contract under consideration was executed on July 6, 1949, and was to continue for a period of 25 years. It provided that all office furniture, equipment, fixtures and all of the operating records of the company were to remain the property of the taxpayers and payment for these items was made by the taxpayers out of the 40% mentioned above. In the early years of

their business, the Woolsey brothers were managers of a local mutual aid association which had the right to sell insurance policies only within 100 miles of Corpus Christi, Texas. In 1943 they purchased from one Glass a "management contract" in existence between Glass and another mutual insurance company, together with the company's charter, and for that right together with certain other assets, the Woolseys paid Glass the sum of $6,500.00. As a result of this purchase, the Woolseys were authorized to sell insurance on a state-wide basis rather than on a limited basis as had been the case prior to that time. For a number of years prior to 1955 the partnership filed Federal partnership returns showing income from the "management contract," and deductions for operative expenses of the insurance company together with deductions for depreciation attributable to the physical assets used in the operation and for amortization for the cost of the state-wide charter. The partnership return filed for 1954 was examined by Internal Revenue Service and accepted without change. The partnership owned no right to any renewal commissions on any insurance, but both of the brothers owned rights to renewal commissions for insurance written by them individually. Such rights to renewal commissions were not sold.

All negotiations and the sale involved, the management contract, all the physical assets used in connection with management, the state-wide charter, and the operating records owned by the partnership together with all good will. The sale was consummated on August 15, 1955.[2]

1. The plaintiff, R. T. Woolsey died after suit was filed, but his wife, Gertrude Woolsey, qualified and is serving as independent Executrix.

2. Prior to August 15, 1955, there were negotiations between the Woolseys and Austin Life Insurance Company for the sale of the partnership business of Gulf Security Life Insurance Co., including the "management contract" with Gulf Security Life Insurance Company, the state-wide charter, physical assets and good will. (The name of the insurance corporation is Gulf Security Life Insurance *Company*. The name of the partnership is Gulf Security Life Insurance *Co.*) As negotiations developed, Austin Life indicated that George M. Engle would make the purchase instead of Austin Life and the sale was finally consummated with Engle, although the Woolseys would have sold under the same terms directly to Austin Life Insurance Company. Austin Life never did make an offer. On August 15, Engle entered into an agreement with Austin Life Insurance Company and a

In their respective returns for the year 1955, the taxpayers reported their gain from the sale on an installment basis as authorized by § 453 of the I.R.C. of 1954,[3] a pro rata portion of such gain having been reported in the years 1955 through 1959. Profits were treated as long term capital gains. The contract between the Woolseys and Gulf Security Life Insurance Company was to continue for a period of 25 years, and it contained a provision authorizing an assignment of the contract by the Woolseys in whole or in part. At the time of the assignment and sale of the contract by the Woolseys,

there remained a period of approximately 19 years of the 25 years originally agreed upon. The Government contended that the gain from the sale to Engle was ordinary income rather than a capital gain and asserted tax deficiencies. These deficiencies were paid by the plaintiffs, claims for refund were filed and denied, and thereafter this suit for refund was filed.

The taxpayers urgently insist that the sale involved was a sale of capital assets either under § 741 or §§ 1221–1222, I.R.C. of 1954.[4] The taxpayers vigorously

---

separate agreement with a partnership insurance agency in which neither of the Woolseys had any interest. The agreement between Engle and Austin Life was that Engle would use his best efforts to obtain re-insurance by Austin Life of all outstanding life insurance policies of Gulf Security Life Insurance Company; and if successful, Austin Life agreed to pay Engle an amount in excess of that which Engle had agreed to pay the Woolseys.

In the contract between Engle and the partnership insurance agency (in which the Woolseys had no interest) Engle agreed that in the event of re-insurance as above mentioned by Austin Life, to convey the "management contract", statewide charter, good will, records, etc. to such partnership agency. If Engle was unsuccessful in his attempt to get approval of the re-insurance by Austin Life, the partnership insurance agency had an option to buy the "management contract", etc. acquired by Engle in his purchase from the Woolseys in which case the consideration to be paid was the same as the consideration to be paid by Engle to the Woolseys. Engle remained the owner of the Woolsey partnership from August 15, 1955 to October 1, 1955, and earnings therefrom were reported on his individual income tax returns. On October 1, the life insurance policies of Gulf Security were re-insured by Austin Life pursuant to the contract between Austin Life and Engle dated August 15, 1955. The remaining assets of what had been the partnership owned by the Woolseys were then conveyed by Engle to another partnership insurance agency composed of officers and others interested in Austin Life. Austin Life paid Mr. Engle $22,-600.00 in cash and the balance of the payments due Mr. Engle by Austin Life were paid directly by Austin Life to the Woolseys, which amounts had been as-

signed to them by Engle as security for his obligations to the Woolseys under the contract dated August 15, 1955.

3. The question of whether or not the taxpayers could report their sales profits on an installment basis under § 453 of the I.R.C. of 1954 was an issue in the trial court. The trial court found that the taxpayers were entitled to use the installment method, but that question is not an issue on this appeal.

4. SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.
"In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value)."
(26 U.S.C. 1958 ed., Sec. 741.)
SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS.
"(a) Sale or exchange of interest in partnership.—The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to—(1) unrealized receivables of the partnership, or (2) inventory items of the partnership which have appreciated substantially in value, shall be considered as an amount realized from the sale or exchange of property other than a capital asset."
                    * * *
"(c) Unrealized receivables.—For purposes of this subchapter, the term 'unrealized receivables' includes, to the extent not previously includible in income under the method of accounting used by

contend that they sold a complete partnership interest which is a capital asset entitled to long term capital gains treatment as provided by § 741; and they claim that § 751 [5] does not apply because there were no (1) unrealized receivables, or (2) inventory items which have appreciated substantially in value. The taxpayers lay much stress on the fact that the sale was of "a partnership" and "a going concern," and therefore contend that the entire transaction must be treated as the sale of a capital asset. It is strenuously argued that under the facts in this case the consideration should not be comminuted, fractionalized or fragmented and allocated to the various component parts of the "bundle" of rights and interests transferred. Although the taxpayers set forth persuasive and ingenious arguments, we cannot agree with them.

■■ In analyzing the problems presented by this case, it is appropriate to state that the courts have long held that the term "capital asset" is to be narrowly construed and defined. The term connotes the investment of money in property with a resulting appreciation in value accruing over the requisite length of time,[6] and the statute is designed to lessen the hardship of taxing such appreciation in one year. Hort v. Com'r, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); Corn Products Refining Co. v. Com'r., 350 U.S. 46, 76 S.Ct. 20, 100 L. Ed. 29 (1955); Com'r v. Gillette Motor Co., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed. 2d 1617 (1960). Throughout the Revenue Code there are exclusions and exceptions to the statute authorizing capital gains treatment. Section 751 is an illustration of such exclusions. While the term "capital asset" is to be narrowly construed,

the partnership, any rights (contractual or otherwise) to payment for—

"(1) goods delivered, or to be delivered, to the extent the proceeds therefrom would be treated as amounts received from the sale or exchange of property other than a capital asset, or

"(2) services rendered, or to be rendered."

(26 U.S.C. 1958 ed., Sec. 751.)

SEC. 1221. CAPITAL ASSET DEFINED.

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

"(3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

"(A) a taxpayer whose personal efforts created such property, or

"(B) a taxpayer in whose hands the basis of such property is determined,

for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;

"(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

"(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue."

(26 U.S.C. 1958 ed., Sec. 1221.)

SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.

"For purposes of this subtitle—

* * *

"(3) Long-term capital gain.—The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income."

(26 U.S.C. 1958 ed., Sec. 1222.)

5. See Note No. 4 above.

6. See Haden, Fundamentals of Federal Taxation (1959) p. 94, et seq.

the exclusions or exceptions from the operation of the capital gains statute are to be broadly and liberally construed. Corn Products Refining Co. v. Com'r, supra.

■ Intricate and complicated problems are presented in applying the recognized rules to the facts in each case. Fundamental to a proper decision in each case, and to the application of well recognized rules, is a determination of the type and nature of the underlying right or property assigned or transferred. It is always pertinent to inquire how the proceeds to be received would have been taxable if there had been no assignment of the contract. Close scrutiny is required if the consideration received is actually a present substitute for what would have been ordinary earned income in the hands of the assigning taxpayer, if the assignment or transfer had not been made. A mere "sale or exchange" does not convert a right to earn income in the future which would be taxable as ordinary income to the taxpayer, into a capital gain. See Mertens Law of Fed. Income Tax., Vol. 3B, § 2212, pp. 59–60.

■ The taxpayers have thoroughly impressed upon us their strong reliance upon § 741 dealing with the capital asset provision in the sale or exchange of an interest in a partnership; but we cannot escape the conclusion that the taxpayers have over-emphasized § 741 and have de-emphasized the exceptions to it as set forth in § 751. The existence of a partnership does not result in the creation of a sovereign alchemist that can transmute ordinary income into a capital asset. When we look at the underlying right assigned in this case, we cannot escape the conclusion that so much of the consideration which relates to the right to earn ordinary income in the future under the "management contract," taxable to the assignee as ordinary income, is likewise taxable to the assignor as ordinary income although such income must be earned. Section 751 has defined "unrealized receivables" to include any rights, contractual or otherwise, to ordinary income from "services rendered, *or to be rendered*," (emphasis added) to the extent that the same were not previously includable in income by the partnership, with the result that capital gains rates cannot be applied to the rights to income under the facts of this case, which would constitute ordinary income had the same been received in due course by the partnership. Roscoe v. Com'r., 5 Cir.1954, 215 F.2d 478; Wiseman v. Halliburton Oil Well Cementing Co., 10 Cir.1962, 301 F.2d 654; Holt v. Com'r., 9 Cir.1962, 303 F.2d 687; United States v. Eidson, 5 Cir.1962, 310 F.2d 111. As stated by Judge Friendly in footnote 3 in Ferrer, 2 Cir. 1962, 304 F.2d 125, after summarizing numerous cases dealing with the problem:

> "These cases could well have been decided on the basis that the taxpayer held only a contract right giving him an opportunity to earn future income."

It is our conclusion that such portion of the consideration received by the taxpayers in this case as properly should be allocated to the present value of their right to earn ordinary income in the future under the "management contract" is subject to taxation as ordinary income. This conclusion is not affected by the fact that the management contract was owned by a partnership.[7] To paraphrase a

7. § 751 did not appear in the 1939 Revenue Code. It was enacted to clarify questions in cases involving a partnership interest, and was intended to " * * * prevent the use of the sale of an interest in a partnership as a device for converting rights to income into capital gain." H.Rep. # 1337, 83rd Cong. 2nd Session, p. 70, U.S.Code Cong. & Adm. News 1954, p. 4096.

Further, as stated in S.Rep. # 1622, p. 99, U.S.Code Cong. & Adm.News 1954, p. 4732:

"The provisions relating to unrealized receivables and appreciated inventory items are necessary to prevent the use of the partnership as a device for obtaining capital-gain treatment on fees or other rights to income and on appreciated inventory. Amounts attributable to such

statement from C.I.R. v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958): In short, consideration was paid for the right to earn and receive future income, not for an increase in the value of the income producing property.

We further conclude that while the assets sold may have consisted mainly of the "management contract," the consideration for which must be treated as ordinary income, capital assets also appear to have been transferred and sold.[8] We refer to such apparent capital assets as operating records of the company; good will; and the state-wide charter. C.I.R. v. Killian, 5 Cir.1963, 314 F.2d 852. In our opinion, part of the consideration involved requires taxation as ordinary income, and another part of it apparently requires capital gains treatment; and therefore, the consideration involved should be comminuted into its fragments and the purchase price or consideration should be allocated among the various assets sold. Williams v. McGowan, 2 Cir.1945, 152 F.2d 570, 162 A.L.R. 1036; C.I.R. v. Chatsworth Stations Inc., 2

Cir.1960, 282 F.2d 132; C.I.R. v. Ferrer, 2 Cir. 1962, 304 F.2d 125; United States v. Eidson, 5 Cir.1963, 312 F.2d 744; Bisbee-Baldwin Corp. v. Tomlinson, 5 Cir.1963, 320 F.2d 929.

While we are aware of the fact that it will be difficult to fragmentize the consideration, the difficulty of the task is no answer to the problem. Perfect accuracy cannot and is not expected. As stated in Ferrer, "* * * roughly hewn the decision may be, the result is certain to be fairer than either extreme * * *". Accordingly, we reverse and remand to the trial court for the purpose of determining what portion of the consideration received by the taxpayers should be allocated to the "management contract" to be taxed as ordinary income; and what portion thereof should be allocated to other assets transferred which may be determined to be capital assets qualified for capital gains treatment. Further evidence will be required unless the parties can agree upon a practical solution of the problems presented.

Reversed and remanded.

rights would be treated as ordinary income if realized in normal course by the partnership. The sale of a partnership interest or distributions to partners should not be permitted to change the character of this income. The statutory treatment proposed, in general, regards the income rights as severable from the partnership interest and as subject to the same tax consequences which would be accorded an individual entrepreneur."

8. The trial court originally concluded as follows:
"I, therefore, conclude that the Plaintiffs in this case, under the contract of August 15, 1955, sold a partnership business and all the constituted assets of the same, and mainly the 'management contract' with Gulf Security, gain from the sale of which is long-term capital gain for Federal income tax purposes under Section 741, Title 26, U.S.C.A.; and that

they are entitled to their refund, and are also entitled to report the same on the installment method under Section 453 of the Internal Revenue Code of 1954."
In his supplemental conclusion of law the trial court further found:
"I hold that a sale by a partnership of a 'management contract' with a mutual insurance company in Texas, is the sale of a capital asset under Sections 1221, 1222, and/or 741, Title 26, U.S.C.A., and I agree with the conclusions of law reached by the Court in Eidson, et al. v. United States, 61–2 U.S.T.C. 9668, 8 A.F.T.R.(2) 5495, where, as distinguished from the instant case, the only asset sold by the partnership (which apparently was its only asset) was such a 'management contract'."[9]

9. But see our decision in United States v. Eidson, 5 Cir. 1962, 310 F.2d 111; and per curiam decision on petition for rehearing, 5 Cir. 1963, 312 F.2d 744.