JOHN W. LEDOUX AND GERALDINE C. LEDOUX, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9470–78.    Filed August 10, 1981.

*Maxwell W. Wells, Jr.*, for the petitioners.
*Avery Cousins III*, for the respondent.

STERRETT, *Judge*: By statutory notice dated May 16, 1978, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| TYE Dec. 31— | Deficiency |
| --- | --- |
| 1972 | $16,773.86 |
| 1973 | 16,246.07 |
| 1974 | 16,016.48 |

After concessions, the sole issue remaining for our decision is whether any portion of the amount received by petitioner John W. Ledoux pursuant to an agreement for the sale of a

partnership interest was attributable to an unrealized receivable of the partnership and thus was required to be characterized as ordinary income under section 751, I.R.C. 1954.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference.

Petitioners John W. Ledoux and Geraldine C. Ledoux, husband and wife, resided in Winter Park, Fla., at the time of the filing of their petition herein. They filed joint Federal income tax returns for the calendar years 1972, 1973, and 1974 with the Internal Revenue Service Center at Chamblee, Ga. Geraldine C. Ledoux is a party herein solely by reason of her filing a joint return with John W. Ledoux (hereinafter petitioner).

Pari-mutuel wagering at greyhound dogracing tracks was legalized in the State of Florida in 1935. Prior to July 1955, the Sanford-Orlando Kennel Club, Inc. (hereinafter referred to as the corporation), held a greyhound racing permit issued by the Florida State Racing Commission to operate a racetrack in Seminole County, Fla. The corporation owned certain land in Seminole County, Fla., and improvements thereon including a grandstand, kennels, track, and other facilities and equipment necessary to operate a racetrack and to handle pari-mutuel pools. The sole shareholders of the corporation were a Mr. Anderson and a Mr. Davey. Also prior to July 1955, the corporation had entered into an operating agreement with the Sanford-Orlando Kennel Club, a copartnership composed of Messrs. Anderson and Davey, as the partners. Under the agreement, the copartnership was to operate the track and the corporation was to receive 30 percent of the net profits from the dog track operation.

Due to problems in managing the dog track, the Sanford-Orlando Kennel Club copartnership entered into a written agreement (dog track agreement) on July 9, 1955, with Jerry Collins, an experienced operator of dogracing tracks, and his son, Jack Collins. Pursuant to the dog track agreement, the Collinses acquired the right "to manage and operate the Greyhound Racing Track, owned by the Sanford-Orlando

Kennel Club, Inc.," for a period of 20 years commencing on October 1, 1955. In return, the Collinses agreed to pay to the copartnership the first $200,000 of net annual profit from track operations. Representatives of the copartnership were given the right to enter the racetrack during normal business hours for purposes of inspecting and making necessary repairs to the premises. Further, any structural improvements or alterations to the dog track involving an estimated cost of over $50,000 that the Collinses wanted to make had to be approved in advance by the copartnership.

On October 1, 1955, petitioner John W. Ledoux, his father-in-law, Jerry Collins, and his brother-in-law, Jack Collins, entered into a partnership agreement creating a partnership (hereinafter the Collins-Ledoux partnership or partnership) for the stated purpose of "carrying on of the business of managing and operating a greyhound dog racing plant in Seminole County, Florida." The percentage interests in the Collins-Ledoux partnership, and the respective profits and losses interests therein, were as follows:

| Partners | Partnership interest |
|---|---|
| Jerry Collins | 50 percent |
| Jack Collins | 25 percent |
| John Ledoux | 25 percent |

The dog track agreement was amended on January 25, 1957, to include petitioner John W. Ledoux as a party thereto.

Under Florida law, the corporation's dogracing permit was not readily transferable. Accordingly, the racing permit had remained in the name of the corporation at all times from 1955 through 1972. On November 29, 1957, the Sanford-Orlando Kennel Club copartnership terminated and the corporation succeeded to all interests of the copartnership in the July 9, 1955, agreement, as amended.

On June 30, 1956, the term of the dog track agreement was extended to September 1, 1985, conditioned on the expenditure by the Collins-Ledoux partnership of $100,000 for improvements in the clubhouse and the clubhouse furnishings on property owned by the corporation. On April 10, 1966, the dog track agreement was extended further to September 30, 1999. This extension was premised on the Collins-Ledoux partner-

ship increasing the annual payment to the corporation to include a percentage of the annual mutuel play revenue from the track. On June 9, 1972, an amendment to the agreement further modified the method of computing the annual payment to the corporation. This amendment was conditioned on the Collins-Ledoux partnership replacing the track's grandstand facilities at a cost to the partnership of not less than $1 million.

During the period from October 1, 1955, to September 30, 1972, the Collins-Ledoux partnership operated the greyhound racetrack pursuant to and in accordance with the July 9, 1955, agreement, as amended. Petitioner John W. Ledoux was a manager of the operations of the racetrack for the Collins-Ledoux partnership. Petitioner received compensation for his services in the form of salary, which was charged as an expense of the track operation. Along with his salary, petitioner received a share of the net profits of the Collins-Ledoux partnership. Petitioner's duties included, among other things, the directing of promotional, advertising, and development activities on behalf of the Collins-Ledoux partnership.

In addition, during this period the partnership made improvements to the corporation's property. Virtually every building was replaced except for the main grandstand, which was remodeled extensively. The Collins-Ledoux partnership also acquired property adjacent to the corporation's dog track property for additional parking, paddocks, and kennels, all of which were used in connection with the operation of the dog track. The partnership invested $56,114.56 in equipment for operation of the racetrack, $64,000.71 in improvements to the clubhouse on the corporation's property, $180,327.27 for other new buildings on the corporation's property, and $51,774.93 for kennels on adjacent land owned by the partnership.

The partnership's actions with respect to operation and management of the dog track were eminently successful. During the period from 1955 to 1972, the gross income from track operations increased from $3.6 million to $23.6 million, and the net income to the Collins-Ledoux partnership increased from $72,000 to over $550,000. The increases in gross and net income were attributable to the work of the partnership, including petitioner, and to the general economic growth in the Central Florida area. Accordingly, the fair value of the

right to operate the greyhound racetrack in Seminole County, Fla., pursuant to the racing permit held by the corporation and pursuant to the dog track agreement, increased significantly during the period from 1955 to 1972.

Separate bookkeeping records were maintained for the corporation, the dog track operation, and the partnership. The records of the dog track operation and the corporation were consolidated on the corporation's income tax returns for the years in question. Such corporate income tax returns included the corporation's $200,000 annual payment from gross operating profit, along with any additional percentage payments due under the dog track agreement as amended. Depreciation deductions in connection with the corporation's assets were taken on the corporate returns.

The corporation maintained a separate corporate bank account and there were two bank accounts maintained for the dog track operation, a general account and an operating account. The partnership maintained no separate bank account.

The purposes of the aforementioned general account were to provide the corporation with control over the gross receipts from the dog track and to provide security for the annual payment ($200,000 plus a percentage of the annual mutuel play revenue) due to the corporation. Accordingly, all gross receipts from the dog track operation were deposited daily into the general account. The local accountant for the corporation, Mr. Marion G. Laney, visited the track once or twice a week to check disbursements that had been made by the partnership and to audit the vouchers. Mr. Laney, for the corporation, would transfer funds to the operating account, as needed, for use by the partnership in day-to-day management of the dog track. At the same time, he would be sure to retain sufficient funds in the general account to satisfy the annual amount due to the corporation under the dog track agreement, as amended. The officers of the corporation (the two nonresident corporate shareholders) and their accountant, Mr. Laney, had signature authority to make withdrawals from the general account.

After the corporation retained its proper annual payment and transferred the funds needed for operating expenses, all funds remaining in the general account were turned over by

the corporation to the operating account for unrestricted use by the partnership. The operating account was actually a corporate account maintained for the partnership. The partners of the Collins-Ledoux partnership were the authorized signatories on the account. Deposits into the operating account came from three sources: transfers from the corporation's general account, kennel rents, and proceeds from the partnership borrowings. Disbursements from this account were made for payment of operating expenses of the dog track, for other partnership expenses including purchase of assets and repayment of debts, and for distributions to the partners.

After the 1972 racing season two of the partners, Jerry Collins and Jack Collins, decided to purchase petitioner's 25-percent partnership interest. They agreed to allow Ledoux to propose a fair selling price for his interest. Ledoux set a price based on a price-earnings multiple of 5 times his share of the partnership's 1972 earnings.[1] This resulted in a total value for his 25-percent interest of $800,000. There was no valuation or appraisal of specific assets at the time, and the sales price included his interest in all of the assets of the partnership.

At the request of Jerry Collins, petitioner drafted a "Memorandum Agreement," which reflected the arm's-length agreement of the parties. The memorandum was submitted to Jerry Collins and his attorney, and after slight revision, was executed by the parties to the sale on July 19, 1972. It stated, in part, that the "Seller agrees to sell his complete interest in the partnership of Collins, Collins, and Ledoux and to give up all rights, benefits, and obligations of the various agreements involved." It also stated that "In the determination of the purchase price set forth in this agreement, the parties acknowledge no consideration has been given to any item of goodwill."

In October 1972, Jerry Collins telephoned the petitioner and stated that he would like to close the transaction on October 17, 1972. Mr. Collins requested that petitioner contact his attorney, Ken Murrah, to prepare the necessary closing documents. The attorney drafted the "Agreement for Sale of

---

[1]Petitioner's share of the income from the Collins-Ledoux partnership for 1972 was $161,039.58, the total amount of which was received by petitioner prior to the date of the sale.

Partnership Interest," dated October 17, 1972, based on the memorandum of agreement of July 19, 1972. The agreement of sale set forth the following payment terms:

2. *Purchase Price and Method of Payment.* The purchase price is EIGHT HUNDRED THOUSAND ($800,000.00) DOLLARS and is to be paid in the following manner:

| | |
|---|---|
| $50,000.00 | Paid to seller at the execution of this contract, receipt of which is hereby acknowledged by seller. |
| 750,000.00 | Deferred balance, which is evidenced by a Promissory Note executed by buyer jointly and severally. The terms and method of payment on the deferred balance are set forth in paragraph 3. below. |
| 800,000.00 | |

3. *Terms for Payment of Deferred Balance.* The Promissory Note to be executed jointly and severally by the buyer, JERRY COLLINS and JACK COLLINS, contains the following terms and conditions:

a. Interest at the rate of six and one-half (6½) percent per annum on the unpaid principal balance.

b. Forty (40) quarterly payments to be paid as follows: Forty (40) quarterly payments in the amount of $18,750.00 each, plus accrued interest on the unpaid balance. The first quarterly principal and interest payment is due on January 1, 1973 and each payment thereafter will be due on the first day of April, July, October and January until the entire balance is paid. Interest is to accrue commencing October 1, 1972.

c. There shall be no prepayment privilege on the part of buyer unless consented to in writing by the seller.

At the closing, there was no discussion about values of, or allocation to, any specific assets. In fact, no part of the sales price was allocated to any specific partnership asset. At the time of the sale, the partnership assets consisted of an escrow deposit; certain prepaid expenses; a stock investment in Sanford-Seminole Development Co.; investment in land, buildings, and equipment; improvements on the corporation's property used in connection with the operation of the dog track; and rights arising out of the dog track agreement. The balance sheet of the partnership as of September 30, 1972, was as follows:

Assets:

| | |
|---|---|
| Escrow deposit | $50,000.00 |
| Prepaid insurance | 36.25 |
| Stock—Sanford-Seminole Development Co | 4,000.00 |
| Land | 49,467.60 |

| | |
|---|---:|
| Buildings and equipment | $477,119.09 |
| Less depreciation | (270,318.85) |
| Total assets | 310,304.09 |
| Liabilities | 40,017.54 |

Net worth:

| | |
|---|---:|
| Capital—Jerry Collins | 149,886.33 |
| Capital—Jack Collins | 61,150.66 |
| Capital—Jack Ledoux | 59,249.56 |
| Total | 310,304.09 |

On his 1972 Federal income tax return, petitioner properly elected to report the gain from the sale of his partnership interest under the installment method as prescribed in section 453. Petitioner calculated the total gain on such sale to be as follows:

| | |
|---|---:|
| Sales price | $800,000.00 |
| Basis in partnership interest | 62,658.70 |
| Total gain on sale | 737,341.30 |

During 1972, 1973, and 1974, petitioner received payments in accordance with the October 17, 1972, agreement of sale. In each of those years, he characterized the reported gain, calculated pursuant to the installment sales method, as capital gain.

After consummation of the sale of petitioner's interest in the Collins-Ledoux partnership, the remaining partners continued to operate the dog track under the agreement of July 9, 1955, as amended.

Respondent, in his notice of deficiency, did not disagree with petitioner's calculation of the total gain. However, he determined that $575,392.50 of the gain was related to petitioner's interest in the dog track agreement and should be subject to ordinary income treatment pursuant to section 751.[2]

---

[2]Respondent determined that the value of petitioner's proportionate share of partnership assets other than the dog track agreement was as follows:

| Asset | Value |
|---|---:|
| Escrow deposit | $12,500.00 |
| Sanford-Seminole Development Co. stock | 1,000.00 |
| Fixed assets | 211,107.50 |
| | 224,607.50 |

OPINION

The sole issue presented is whether a portion of the amount received by petitioner on the sale of his 25-percent partnership interest is taxable as ordinary income and not as capital gain. More specifically, we must decide whether any portion of the sales price is attributable to "unrealized receivables" of the partnership.

Generally, gain or loss on the sale or exchange of a partnership interest is treated as capital gain or loss. Sec. 741.[3] Prior to 1954, a partner could escape ordinary income tax treatment on his portion of the partnership's unrealized receivables by selling or exchanging his interest in the partnership and treating the gain or loss therefrom as capital gain or loss. To curb such abuses, section 751 was enacted to deal with the problem of the so-called "collapsible partnership." See S. Rept. 1622, 83d Cong., 2d Sess. 98 (1954). Section 751[4] provides, in part, as follows:

SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS.

(a) SALE OR EXCHANGE OF INTEREST IN PARTNERSHIP.— The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to—

(1) unrealized receivables of the partnership * * *

---

The difference between this value and the total purchase price ($800,000) was treated by respondent as having been received by petitioner in exchange for his rights in the dog track agreement.

[3]Sec. 741 provides as follows:

SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).

[4]The regulations describe the central purpose of sec. 751 as one of income recharacterization. Sec. 1.751–1(a)(1), Income Tax Regs., provides that:

Sec. 1.751–1. Unrealized receivables and inventory items.

(a) *Sale or exchange of interest in a partnership—(1) Character of amount realized.* To the extent that money or property received by a partner in exchange for all or part of his partnership interest is attributable to his share of the value of partnership unrealized receivables or substantially appreciated inventory items, the money or fair market value of the property received shall be considered as an amount realized from the sale or exchange of property other than a capital asset. The remainder of the total amount realized on the sale or exchange of the partnership interest is realized from the sale or exchange of a capital asset under section 741.

\*    \*    \*    \*    \*    \*    \*

(c) UNREALIZED RECEIVABLES.—For purposes of this subchapter, the term "unrealized receivables" includes, to the extent not previously includible in income under the method of accounting used by the partnership, any rights (contractual or otherwise) to payment for—

\*    \*    \*    \*    \*    \*    \*

(2) services rendered, or to be rendered. \* \* \*

Petitioner contends that the dog track agreement gave the Collins-Ledoux partnership the right to manage and operate the dog track. According to petitioner, the agreement did not give the partnership any contractual rights to receive future payments and did not impose any obligation on the partnership to perform services. Rather, the agreement merely gave the partnership the right to occupy and use all of the corporation's properties (including the racetrack facilities and the racing permit) in operating its dog track business; if the partnership exercised such right, it would be obligated to make annual payments to the corporation based upon specified percentages of the annual mutuel handle. Thus, because the dog track agreement was in the nature of a leasehold agreement rather than an employment contract, it did not create the type of "unrealized receivables" referred to in section 751.

Respondent, on the other hand, contends that the partnership operated the racetrack for the corporation and was paid a portion of the profits for its efforts. As such, the agreement was in the nature of a management employment contract. When petitioner sold his partnership interest to the Collinses in 1972, the main right that he sold was a contract right to receive income in the future for yet-to-be-rendered personal services. This, respondent asserts, is supported by the fact that petitioner determined the sales price for his partnership interest by capitalizing his 1972 annual income (approximately $160,000) by a factor of 5. Therefore, respondent contends that the portion of the gain realized by petitioner that is attributable to the management contract should be characterized as an amount received for unrealized receivables of the partnership. Consequently, such gain should be characterized as ordinary income under section 751.

The legislative history is not wholly clear with respect to the types of assets that Congress intended to place under the umbrella of "unrealized receivables." The House report states:

> The term "unrealized receivables or fees" is used to apply to any rights to income which have not been included in gross income under the method of accounting employed by the partnership. The provision is applicable mainly to cash basis partnerships which have acquired a contractual or other legal right to income for goods or services. * * * [H. Rept. 1337, 83d Cong., 2d Sess. 71 (1954).]

Essentially the same language appears in the report of the Senate committee. S. Rept. 1622, 83d Cong., 2d Sess. 98 (1954). In addition, the regulations elaborate on the meaning of "unrealized receivables" as used in section 751. Section 1.751–1(c), Income Tax Regs., provides:

> Sec. 1.751–1 (c) *Unrealized receivables.* (1) The term "unrealized receivables", * * * means any rights (contractual or otherwise) to payment for—
>
> (i) Goods delivered or to be delivered (to the extent that such payment would be treated as received for property other than a capital asset), or
>
> (ii) Services rendered or to be rendered, to the extent that income arising from such rights to payment was not previously includible in income under the method of accounting employed by the partnership. Such rights must have arisen under contracts or agreements in existence at the time of sale or distribution, although the partnership may not be able to enforce payment until a later time. For example, the term includes trade accounts receivable of a cash method taxpayer, and rights to payment for work or goods begun but incomplete at the time of the sale or distribution.
>
> \*       \*       \*       \*       \*       \*       \*
>
> (3) In determining the amount of the sale price attributable to such unrealized receivables, or their value in a distribution treated as a sale or exchange, any arm's length agreement between the buyer and the seller, or between the partnership and the distributee partner, will generally establish the amount or value. In the absence of such an agreement, full account shall be taken not only of the estimated cost of completing performance of the contract or agreement, but also of the time between the sale or distribution and the time of payment.

The language of the legislative history and the regulations indicates that the term "unrealized receivables" includes any contractual or other right to payment for goods delivered or to be delivered or services rendered or to be rendered. Therefore, an analysis of the nature of the rights under the dog track agreement, in the context of the aforementioned legal framework, becomes appropriate. A number of cases have dealt with the meaning of "unrealized receivables" and thereby have helped to define the scope of the term. Courts that have

considered the term "unrealized receivables" generally have said that it should be given a broad interpretation. Cf. *Corn Products Co. v. Commissioner*, 350 U.S. 46, 52 (1955) (the term "capital asset" is to be construed narrowly, but exclusions from the definition thereof are to be broadly and liberally construed). For instance, in *Logan v. Commissioner*, 51 T.C. 482, 486 (1968), we held that a partnership's right in quantum meruit to payment for work in progress constituted an unrealized receivable even though there was no express agreement between the partnership and its clients requiring payment.[5]

In *Roth v. Commissioner*, 321 F.2d 607 (9th Cir. 1963), affg. 38 T.C. 171 (1962), the Ninth Circuit dealt with the sale of an interest in a partnership which produced a movie and then gave a 10-year distribution right to Paramount Pictures Corp. in return for a percentage of the gross receipts. The selling partner claimed that his right to a portion of the payments expected under the partnership's contract with Paramount did not constitute an unrealized receivable. The court rejected this view, however, reasoning that Congress "meant to exclude from capital gains treatment any receipts which would have been treated as ordinary income to the partner if no transfer of the partnership interest had occurred." 321 F.2d at 611. Therefore, the partnership's right to payments under the distribution contract was in the nature of an unrealized receivable.

A third example of the broad interpretation given to the term "unrealized receivable" is *United States v. Eidson*, 310 F.2d 111 (5th Cir. 1962), revg. an unreported opinion (W.D. Tex. 1961).[6] The court there considered the nature of a

---

[5]In *Hale v. Commissioner*, T.C. Memo. 1965-274, we went a step further in dealing with the definition of "unrealized receivable." In that case, we dealt with the situation where a withdrawing partner received real property and a promissory note in exchange for his interest in the partnership assets. One such asset was the right to share in future profits of a real estate development company, which right was conditioned upon the partnership's promise to render future services. We held that the right to future income constituted an unrealized receivable because it was based on the obligation to render future services. The fact that the partnership's development rights had not yet become fixed did not affect the status of the development rights as an unrealized receivable, and did not bar the partner's interest therein from being considered an ordinary income asset.

[6]See also *Hyatt v. Commissioner*, 325 F.2d 715 (5th Cir. 1963), cert. denied 379 U.S. 832 (1964).

management contract which was similar to the one at issue in the instant case. The case arose in the context of a sale by a partnership of all of its rights to operate and manage a mutual insurance company. The selling partnership received $170,000 for the rights it held under the management contract, and the Government asserted that the total amount should be treated as ordinary income. The Court of Appeals agreed with the Government's view on the ground that what was being assigned was not a capital asset whose value had accrued over a period of years; rather, the right to operate the company and receive profits therefrom during the remaining life of the contract was the real subject of the assignment. 310 F.2d at 116. The Fifth Circuit found the Supreme Court's holding in *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260 (1958), to be conclusive:

> The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property. [356 U.S. at 266, cited in 310 F.2d at 115.]

In *United States v. Woolsey*, 326 F.2d 287 (5th Cir. 1963), revg. 208 F. Supp. 325 (S.D. Tex. 1962), the Fifth Circuit again faced a situation similar to the one that we face herein. The Fifth Circuit considered whether proceeds received by taxpayers on the sale of their partnership interests were to be treated as ordinary income or capital gain. There, the court was faced with the sale of interests in a partnership which held, as one of its assets, a 25-year contract to manage a mutual insurance company. As in the instant case, the contract gave the partners the right to render services for the term of the contract and to earn ordinary income in the future. In holding that the partnership's management contract constituted an unrealized receivable, the court stated:

> When we look at the underlying right assigned in this case, we cannot escape the conclusion that so much of the consideration which relates to the right to earn ordinary income in the future under the "management contract," taxable to the assignee as ordinary income, is likewise taxable to the assignor as ordinary income although such income must be earned. Section 751 has defined "unrealized receivables" to include any rights, contractual or otherwise, to ordinary income from "services rendered, *or to be rendered*," (emphasis added) to the extent that the same were not previously includable

in income by the partnership, with the result that capital gains rates cannot be applied to the rights to income under the facts of this case, which would constitute ordinary income had the same been received in due course by the partnership. * * * It is our conclusion that such portion of the consideration received by the taxpayers in this case as properly should be allocated to the present value of their right to earn ordinary income in the future under the "management contract" is subject to taxation as ordinary income. * * * [326 F.2d at 291.]

Petitioner attempts to distinguish *United States v. Woolsey, supra,* and *United States v. Eidson, supra,* from the instant case by arguing that those cases involved a sale or termination of contracts to manage mutual insurance companies in Texas and that the management contracts therein were in the nature of employment agreements. After closely scrutinizing the facts in those cases, we conclude that petitioner's position has no merit. The fact that the *Woolsey* case involved sale of 100 percent of the partnership interests, as opposed to a sale of only a 25-percent partnership interest herein, is of no consequence. In addition, the fact that *Eidson* involved the surrender of the partnership's contract right to manage the insurance company, as opposed to the continued partnership operation in the instant case, also is not a material factual distinction.

The dog track agreement at issue in the instant case is similar to the management contract considered by the Fifth Circuit in *Woolsey.* Each gives the respective partnership the right to operate a business for a period of years and to earn ordinary income in return for payments of specified amounts to the corporation that holds the State charter. Therefore, based on our analysis of the statutory language, the legislative history, and the regulations and relevant case law, we are compelled to find that the dog track agreement gave the petitioner an interest that amounted to an "unrealized receivable" within the meaning of section 751(c).

Petitioner further contends that the dog track agreement does not represent an unrealized receivable because it does not require or obligate the partnership to perform personal services in the future. The agreement only gives, the argument continues, the Collins-Ledoux partnership the right to engage in a business.

We find this argument to be unpersuasive. The words of section 751(c), providing that the term "unrealized receivable"

includes the right to payment for "services rendered, or to be rendered," do not preclude that section's application to a situation where, as here, the performance of services is not required by the agreement. As the Fifth Circuit said in *United States v. Eidson, supra:*

The fact that * * * income would not be received by the [partnership] unless they performed the services which the contract required of them, that is, actively managed the affairs of the insurance company in a manner that would produce a profit after all of the necessary expenditures, does not, it seems clear, affect the nature of this payment. It affects only the amount. That is, the fact that the taxpayers would have to spend their time and energies in performing services for which the compensation would be received merely affects the price at which they would be willing to assign or transfer the contract. * * * [310 F.2d at 115.]

Consequently, a portion of the consideration received by Ledoux on the sale of his partnership interest is subject to taxation as ordinary income.

Having established that the dog track agreement qualifies as an unrealized receivable, we next consider whether all or only part of petitioner's gain in excess of the amount attributable to his share of tangible partnership assets should be treated as ordinary income. Petitioner argues that this excess gain was attributable to goodwill or the value of a going concern.

With respect to goodwill, we note that petitioner's attorney drafted, and petitioner signed, the agreement for sale of partnership interest, dated October 17, 1972, which contains the following statement in paragraph 7:

7. In the determination of the purchase price set forth in this agreement, the parties acknowledge no consideration has been given to any item of goodwill.

The meaning of the words "no consideration" is not entirely free from doubt. They could mean that no thought was given to an allocation of any of the sales price to goodwill, or they could indicate that the parties agreed that no part of the purchase price was allocated to goodwill. The testimony of the attorney who prepared the document indicates, however, that he did consider the implications of the sale of goodwill and even did research on the subject. He testified that he believed, albeit incorrectly, that, if goodwill were part of the purchase price, his client would not be entitled to capital gains treatment.

Petitioner attempts to justify this misstatement of the tax implications of an allocation to goodwill not by asserting mistake, but by pointing out that his attorney "is not a tax lawyer but is primarily involved with commercial law and real estate." We find as a fact that petitioner agreed at arm's length with the purchasers of his partnership interest that no part of the purchase price should be attributable to goodwill. The Tax Court long has adhered to the view that, absent "strong proof," a taxpayer cannot challenge an express allocation in an arm's-length sales contract to which he had agreed. See, e.g., *Major v. Commissioner*, 76 T.C. 239, 249 (1981), appeal pending (7th Cir., July 7, 1981); *Lucas v. Commissioner*, 58 T.C. 1022, 1032 (1972). In *Spector v. Commissioner*, 641 F.2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), the Fifth Circuit, to which an appeal in this case will lie, appeared to step away from its prior adherence to the "strong proof" standard and move toward the stricter standard enunciated in *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967).[7] However, in this case, we need not measure the length of the step since we hold that petitioner has failed to introduce sufficient evidence to satisfy even the more lenient "strong proof" standard.

We next turn to petitioner's contention that part or all of the purchase price received in excess of the value of tangible

---

[7] In *Spector v. Commissioner*, 641 F.2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), the Fifth Circuit examined a transaction in which the taxpayer surrendered his interest in an accounting firm in exchange for a specified sum. Although structured and consummated by all of the parties as a liquidation, the taxpayer argued that the transaction constituted a sale of his partnership interest creating capital gain under sec. 741. The Commissioner contended that the distribution to the taxpayer actually was received in liquidation of his partnership interest, thereby resulting in ordinary income under secs. 736(a)(2) and 707(c). Applying the *Danielson* rule, the Fifth Circuit refused to disregard the terms of the written agreement in the absence of "proof which in an action between the parties to the agreement would be admissible to alter * * * [the Commissioner's] construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967). However, it is difficult to determine the extent to which *Spector* represents the Fifth Circuit's total endorsement of the Third Circuit's rule in *Danielson*. Because *Spector* concerned the characterization of a transaction as a sale or a liquidation, the Fifth Circuit expressly reserved decision with respect to the extent of the application of the *Danielson* rule to cases involving contractual allocations to covenants not to compete. It nevertheless stated that it was "convinced that the *Danielson* rule is not inconsistent with the principles heretofore espoused by this Court in that area." 641 F.2d at 386.

assets is attributable to value of a going concern. In *VGS Corp. v. Commissioner*, 68 T.C. 563 (1977), we stated that—

Going-concern value is, in essence, the additional element of value which attaches to property by reason of its existence as an integral part of a going concern. * * * [T]he ability of a business to continue to function and generate income without interruption as a consequence of the change in ownership, is a vital part of the value of a going concern. * * * [68 T.C. at 591–592; citations omitted.]

However, in the instant case, the ability of the dogracing track to continue to function after the sale of Ledoux's partnership interest was due to the remaining partners' retention of rights to operate under the dog track agreement. Without such agreement, there would have been no continuing right to operate a business and no right to continue to earn income. Thus, the amount paid in excess of the value of Ledoux's share of the tangible assets was not for the intangible value of the business as a going concern but rather for Ledoux's rights under the dog track agreement.

Finally, we turn to petitioner's claim that a determination of the value of rights arising from the dog track agreement has never been made and no evidence of the value of such rights was submitted in this case. We note that the $800,000 purchase price was proposed by petitioner and was accepted by Jack Collins and Jerry Collins in an arm's-length agreement of sale evidenced in the memorandum of agreement of July 19, 1972, and the agreement for sale of partnership interest of October 17, 1972. In addition, the October 17, 1972, sales agreement, written by petitioner's attorney, provided in paragraph 1 that the "Seller [Ledoux] sells to buyer [Jerry Collins and Jack Collins] all of his interest in [the partnership] * * * including but not limited to, *the seller's right to income* and to acquire the capital stock of The Sanford-Orlando Kennel Club, Inc." (Emphasis added.) Section 1.751–1(c)(3), Income Tax Regs., provides that an arm's-length agreement between the buyer and the seller generally will establish the value attributable to unrealized receivables.

Based on the provision in the agreement that no part of the consideration was attributable to goodwill, it is clear to us that the parties were aware that they could, if they so desired, have

310

provided that no part of the consideration was attributable to the dog track agreement. No such provision was made.[8] Furthermore, the agreement clearly stated that one of the assets purchased was Ledoux's rights to future income. Considering that petitioner calculated the purchase price by capitalizing future earnings expected under the dog track agreement, we conclude that the portion of Ledoux's gain in excess of the amount attributable to tangible assets was attributable to an unrealized receivable as reflected by the dog track agreement.

*Decision will be entered for the respondent.*

---

[8]We do not mean to imply that an opposite holding would automatically pertain if a provision had been made with respect to the dog track agreement.