BERNARD D. SPECTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2498–77.    Filed March 20, 1979.

Bernard D. Spector, pro se.
*James R. Turton,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| Year | Income tax |
|------|-----------|
| 1972 | $4,709 |
| 1973 | 12,734 |

The issues for decision are:

(1) Whether certain payments received by petitioner upon disposition of his interest in a partnership are ordinary income or capital gains; and

(2) Whether a pro rata share of legal expenses incurred by petitioner in connection with a divorce settlement agreement is allocable to cash received as part of the settlement and, if so, whether that share is deductible.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner Bernard D. Spector (hereinafter petitioner) filed his income tax returns for the years 1972 and 1973 with the Director, Internal Revenue Service Center, Austin, Tex. On the date on which the petition herein was filed, petitioner resided in Dallas, Tex.

At the beginning of 1969, petitioner was engaged in the practice of accounting in a partnership with Richard Wilson (Wilson) known as Spector, Wilson & Co. Petitioner wanted to sell his practice since he had decided to work exclusively for a client referred to as the Barshop interest. He, therefore, approached John Lahourcade (Lahourcade), whom he had known for many years and who had an office in the same building as petitioner, to discuss the sale of his practice. Lahourcade was a partner in an accounting firm, Bielstein, Lahourcade & Lewis (the Bielstein partnership), which had been started by Walter Bielstein (Bielstein) and Lahourcade in 1955. Noble Lewis (Lewis) joined the firm at a later date.

The Bielstein firm was interested in acquiring petitioner's practice and negotiations were carried on between petitioner and the three members of the Bielstein partnership during January and February 1969. The negotiations culminated in an oral agreement at a meeting at which Lahourcade, Lewis, Bielstein, Wilson, and petitioner were present. This agreement (hereinafter the February agreement) was reduced to written form on February 24, 1969.

Paragraphs 1 and 2 of the February agreement provide for a sale of all of Spector, Wilson & Co.'s accounts receivable to the Bielstein partnership as of April 30, 1969, for cash less 8 percent,[1] with petitioner personally guaranteeing the collection of the accounts.

Paragraphs 3 through 7 outline a plan for merger of Spector, Wilson & Co. and the Bielstein partnership, withdrawal of petitioner from the "merged" partnership, and payments to petitioner by the Bielstein partnership as follows:

3. On May 1, 1969 Spector, Wilson & Co. merges with Bielstein [defined in paragraph 1 of the agreement as Bielstein, Lahourcade & Lewis].

4. On May 2, 1969 Spector withdraws from partnership.

5. Bielstein agrees to pay Spector $96,000 in 4 equal annual installments. The first payment being due on May 2, 1970.

---

[1]Certain accounts totaling less than $5,000 were excluded from the agreement.

6. [This paragraph provides for a reduction of the payments to be made to petitioner if certain accounts do not use the regular services previously performed by Spector, Wilson & Co. during the first year ending after May 1, 1969.]

7. In the agreement for withdrawal, Bielstein agrees to pay the $96,000 as guaranteed payments to a retiring partner with one-half explicitly allocated to an agreement not to compete for the term of the pay-out. Bielstein retains all furniture, fixtures, and supplies previously owned by Spector, Wilson & Co. subject to any debt on the typewriter, dictating equipment, and calculator. Spector, Wilson & Co. will make the regular payments currently due through April 30, 1969. All other assets and liabilities of Spector, Wilson & Co. as of April 30, 1969 are retained by Spector.

The agreement was signed by Bielstein, Lahourcade, and Lewis for the Bielstein partnership and by petitioner acting individually and for Spector, Wilson & Co. Lewis, the tax partner in the Bielstein partnership, worked out the details of the agreement with petitioner. Wilson had little, if any, role in the negotiations.

On May 2, 1969, two agreements were signed to carry out the plan outlined in the February agreement. The first agreement is captioned "Merger Agreement" and states in relevant part:

Bielstein, Lahourcade and Lewis and Spector and Wilson hereby agree to merge their accounting practice partnerships into one accounting practice partnership.

The effective date of this merger is May 3, 1969.

The partnership thus formed shall be known as Bielstein, Lahourcade and Lewis merged with Spector and Wilson.

The second agreement is entitled "Withdrawal Agreement" and provides:

By mutual consent of all of the partners of Bielstein, Lahourcade and Lewis merged with Spector, Wilson and Co., Bernard Spector hereby withdraws from the partnership effective May 5, 1969.

In consideration of for [sic] Spector's withdrawal, Spector will be entitled to receive from the partnership for services or for the use of capital a "guaranteed payment" of $96,000.00, with one half of said amount allocated to an agreement not [to] compete with the remaining partners over the term of the payout period.

The guaranteed payments shall be paid to the withdrawing partner, Bernard D. Spector as follows: $24,000.00 to be paid on May 1, 1970, with one half being considered as attributed to the agreement not to compete; $24,000.00 to be paid on May 1, 1971, with one half being considered as attributed to the agreement not to compete; $24,000.00 to be paid on May 1, 1972, with one half being considered as attributed to the agreement not to compete; and $24,000.00

to be paid on May 1, 1973, with one half being considered as attributed to the agreement not to compete.

Furthermore, none of the guaranteed payments provided for in this agreement are for partnership property within the meaning of Section 736 IRC of 1954.

Bernard D. Spector hereby covenants and agrees not to enter into the practice of public accounting in the Austin Internal Revenue District for a period of four (4) years from May 1, 1969 through May 1, 1973, and further not to render accounting services to any of the clients of the partnership, except for the account of the partnership to be billed at regular rates.

In the event Spector does compete in the accounting business with the partnership, the amounts paid to Spector on the "guaranteed payments" shall be repaid to the partnership by Spector as liquidated damages.

The meaning attributed to the words "guaranteed payments" provided for in this contract is the definition provided for such term in Section 707 of the Internal Revenue Code of 1954 and Regulation Section 1.707–1(c).

The withdrawing partner's only interest in the continuing partnership will be in the right to receive the guaranteed payments. No capital gains or losses, depreciation, depletion, amortization, special elective deductions, contributions, credits or other items of income and expense attributed to partners generally, will be attributed to the withdrawal partner.

Both agreements were signed by Bielstein, Lahourcade, Lewis, petitioner, and Wilson on behalf of Bielstein, Lahourcade & Lewis, merged with Spector, Wilson & Co.

The amount of $96,000 to be paid to petitioner was determined by valuing his practice at 100 percent of its average gross annual fees. The agreements were structured as a merger followed by a withdrawal of petitioner from the "merged" partnership solely in order to allow the Bielstein partnership a deduction for income tax purposes of the amount paid to petitioner. Petitioner did not want to report the whole amount that he was to receive as ordinary income, but the Bielstein partnership wanted assurance that petitioner would report some part of the payments as ordinary income, so that the deductibility of at least part of the payments would be less likely to be challenged. Therefore, half of each installment was allocated to a covenant not to compete to distinguish the part petitioner intended to report as ordinary income from the part he intended to report as capital gains. All the parties to the agreements were aware of their potential tax consequences.

Petitioner was nominally a partner in the "merged" partnership for 3 days. He never performed any services for the "merged" partnership. He had no desk or office. He contributed no capital. There was, however, a capital account of $2,000 or

$3,000 set up to reflect the cost of furniture which had belonged to him. There was never any intention on the part of any of the parties to the agreements that petitioner would engage in the practice of accounting with the members of the Bielstein partnership.

Richard Wilson joined the Bielstein partnership as a partner.

Petitioner received $23,500 from the Bielstein partnership in 1972, of which he reported $11,750, as capital gains. Petitioner received $23,500 from the Bielstein partnership in 1973, all of which was omitted from his 1973 return. Respondent determined that the entire amount received by petitioner in each year should have been reported as ordinary income.

Petitioner incurred legal expenses of $37,177 in 1972 incident to a divorce property settlement. Under the property settlement agreement, petitioner received a total of $449,407 in cash and property consisting of $60,300 in cash and the following property:

| Stock | Adjusted basis | Value |
|---|---|---|
| Arco | $10,300 | $4,932 |
| BME | 5,400 | 370,000 |
| Barshop Holcomb | 1,875 | 1,875 |
| Barshop South Loop | 1,500 | 1,500 |
| *Real estate* | | |
| Maple Street property | 10,800 | 10,800 |

Respondent allocated the legal expenses pro rata among the properties and the cash received by petitioner, in accordance with their relative values, so that $4,989 was allocated to the cash received and the rest served to increase the bases of the properties received by petitioner.

## OPINION

The first issue for decision is whether petitioner had ordinary income or capital gain when he received annual installment payments in 1972 and 1973 which were denominated "guaranteed payments" to a retiring partner in written agreements to which he was a party. Parts of those payments allocated to a covenant not to compete are not in dispute, since petitioner has conceded that those amounts were ordinary income.

Respondent rests his case upon the form of the agreements

signed by petitioner, arguing that the agreements show that petitioner's partnership was merged into the Bielstein partnership and, thereafter, petitioner withdrew from the merged partnership, receiving guaranteed payments in liquidation of his partnership interest. Under section 736[2] payments made by a partnership in liquidation of the interest of a retiring partner (other than payments for an interest in partnership property or for goodwill where such payments are provided for in the partnership agreement) shall be considered guaranteed payments described in section 707(c), if the amount thereof is determined without regard to the income of the partnership.[3] Such payments are deductible by the partnership in computing the distributive shares of the remaining partners and constitute ordinary income of the retiring partner.

Petitioner contends that the substance of the transaction at issue, rather than the form in which it was cast, should control its tax consequences. He argues that he never became a partner in the Bielstein partnership and that the transaction was a sale of his partnership interest in Spector, Wilson & Co. to an unrelated third party. Section 741[4] provides that a transferor partner realizes capital gain or loss on the sale of his interest in a part-

---

[2] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the taxable year at issue.

[3] SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST.

(a) PAYMENTS CONSIDERED AS DISTRIBUTIVE SHARE OR GUARANTEED PAYMENT.—Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered—

(1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or

(2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership.

(b) PAYMENTS FOR INTEREST IN PARTNERSHIP—

(1) GENERAL RULE.—Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a).

(2) SPECIAL RULES.—For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for—

(A) unrealized receivables of the partnership (as defined in section 751(c)), or

(B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will.

[4] SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).

nership, whether to a continuing partner or to a third party, except to the extent that the payments are attributable to unrealized receivables and inventory items. Sec. 751.[5]

In the alternative, petitioner argues that, even if we hold that he became a partner in the Bielstein partnership, he is nevertheless entitled to capital gains treatment because, although the payments were in liquidation of his partnership interest, they were payments with respect to goodwill pursuant to a provision for such payments in the partnership agreement. See sec. 736(b)(2)(B).

Where a taxpayer seeks to establish a position at variance with the language of a written agreement to which he was a party, this Court requires strong proof that the form of the agreement does not reflect its substance.[6] *Coven v. Commissioner*, 66 T.C. 295, 304–305(1976); *Lucas v. Commissioner*, 58 T.C. 1022, 1032 (1972); *Schmitz v. Commissioner*, 51 T.C. 306, 316–318 (1968), affd. sub nom. *Throndson v. Commissioner*, 457 F.2d 1022 (9th Cir. 1972). If the agreement has "some independent basis in fact or some arguable relationship with business reality," the taxpayer will be bound by the tax consequences apparent on the face of the agreements. *Schultz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); *Wager v. Commissioner*, 52 T.C. 416, 419 (1969); *Schmitz v. Commissioner, supra* at 316.

The petitioner in this case has adduced strong proof that the agreements which he signed did not reflect reality, insofar as his status as a partner in the Bielstein partnership is concerned.

The evidence clearly shows that petitioner never entered into a partnership with the members of the Bielstein firm. The test

---

[5]Petitioner sold his accounts receivable to the Bielstein partnership pursuant to the February agreement for a price independent of the amounts at issue herein and respondent does not assert that any part of the amounts at issue are taxable as ordinary income under sec. 751. Nor does either party contend that any part of the payments were consideration for petitioner's interest in partnership property as that term is used in sec. 736(b), except insofar as petitioner's alternate argument relates to treatment of goodwill as partnership property under sec. 736(b)(2)(B).

[6]This Court has not adopted the rule of *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965), that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." See *Schmitz v. Commissioner*, 51 T.C. 306, 316–318 (1968), affd. sub nom. *Throndson v. Commissioner*, 457 F.2d 1022 (9th Cir. 1972); *Lafayette Extended Care, Inc. v. Commissioner*, T.C. Memo. 1978–233. The Fifth Circuit, to which this case is appealable, has used the "strong proof" test and has not had occasion to consider the *Danielson* case. See *Dixie Finance Co. v. United States*, 474 F.2d 501 (5th Cir. 1973).

of whether a partnership exists as established by the Supreme Court in *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949) is:

whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

See also *Luna v. Commissioner*, 42 T.C. 1067, 1077–1078 (1964); *James v. Commissioner*, 16 T.C. 930, 939 (1951), affd. 197 F.2d 813 (5th Cir. 1952).

From the agreements signed by the parties, it is evident that petitioner was never a real partner of the members of the Bielstein partnership. The February agreement provided that petitioner would be a partner in the "merged" partnership for only 1 day. By the terms of the May 2 agreement, petitioner's tenure as a partner was to last for only 3 days. That agreement also provided that petitioner would not share in the profits and losses of the "merged" partnership and that he would have no interest in the partnership other than the right to receive "guaranteed payments."

None of the parties to the transaction ever intended that petitioner would perform any services for the "merged" partnership nor did he perform any. From the inception of the transaction, they knew that petitioner wished to dispose of his practice and go to work for the Barshop interest. Petitioner had no desk or office. He contributed no capital.[7] The testimony of all the witnesses (including two who were partners of the Bielstein partnership at the time of the negotiations and agreements in 1969) indicated that the sole purpose for structuring the transaction as a merger was to achieve tax results beneficial to the Bielstein partnership. Thus, it cannot be said, as far as petitioner is concerned, that "the parties in good faith and acting with a business purpose intended to join together in the present conduct of [an] enterprise."[8]

Other elements of the transaction also lead us to conclude that petitioner did not relinquish his partnership interest to a part-

---

[7]A minimal capital account was set up for him to represent the value of his office furniture and fixtures.

[8]Cf. *Kelly v. Commissioner*, T.C. Memo. 1970–250.

nership of which he was a member. The negotiations in which the transaction was structured were carried on primarily between petitioner on one side and Lewis and Lahourcade on the other side. Petitioner's own partner Wilson had little part in the negotiations. The February agreement in which the amount and manner of payments were determined was signed by all the members of the Bielstein partnership and by petitioner, acting individually and on behalf of Spector, Wilson & Co. Wilson did not sign that agreement. Prior bargaining is indicative of the true nature of a transaction. *Coven v. Commissioner, supra* at 307; *Foxman v. Commissioner*, 41 T.C. 535, 552 (1964), affd. 352 F.2d 466 (3d Cir. 1965). Moreover, the price agreed upon, 100 percent of petitioner's gross annual fees, indicates that what was transferred was the right to service petitioner's accounts and that, in essence, the Bielstein partnership purchased petitioner's share of the goodwill of Spector, Wilson & Co. *Karan v. Commissioner*, 319 F.2d 303, 306 (7th Cir. 1963), affg. *Estate of Melnik v. Commissioner*, T.C. Memo. 1962–129; *Lucas v. Commissioner*, 58 T.C. at 1034. See also *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1247 (5th Cir. 1973). We are convinced that the merger of partnerships, followed by petitioner's withdrawal from a "merged" partnership, as described in the agreements, never actually occurred.[9] What did occur was a sale by petitioner of his share of the goodwill of Spector, Wilson & Co., not to his partnership or to continuing partners, but to outsiders, the Bielstein partnership. Section 736 is, therefore, inapplicable because it applies only to payments made by a partnership to one of its own partners. *Karan v. Commissioner, supra* at 307; *Coven v. Commissioner, supra* at 307; *Cooney v. Commissioner*, 65 T.C. 101, 108 (1975); sec. 1.736–1(a), Income Tax Regs.[10] Under section 741, petitioner is entitled to report the disputed amounts, received upon the sale of his partnership interest, as capital gains.

A similar result was reached by this Court in *Coven v. Commissioner, supra*. In that case, the taxpayer entered into an agreement calling for a transfer of his partnership interest to one of his partners. This agreement was superseded by another agreement called a consultant contract in which the taxpayer's

---

[9]Cf. *Atkinson v. Commissioner*, T.C. Memo. 1964–137.
[10]See also *Champlin v. Commissioner*, T.C. Memo. 1977–196.

partner agreed to make payments, similar to those required by the original contract, in exchange for consulting services. The taxpayer never intended to, and never did, render any formal consulting services. Both parties understood the tax implications of the consultant contract and the taxpayer's partner expected the taxpayer to report the payments made under the contract as ordinary income. The taxpayer, nevertheless, reported the income as capital gains and respondent determined a deficiency, asserting that the payments were ordinary income. We sustained the taxpayer's position, finding that he had offered strong proof that the form of the contract did not reflect its substance and that the taxpayer had, in fact, sold his partnership interest to his partner.

*Foxman v. Commissioner, supra,* on which respondent relies, is not controlling herein. In that case, we expressed reluctance to disregard the form of an agreement entered into by the members of a partnership. We reasoned that one of Congress's objectives in providing, in sections 736 and 741, the options of a sale or a liquidation of a withdrawing partner's interest in his partnership, was to permit partners, through bargaining among themselves, to allocate their tax burdens to a certain extent.[11] That reasoning is not applicable here because we have found that the present case does not involve a bargain reached between a partner and his own partners.[12]

We are not unaware of the difficulties involved in permitting a taxpayer to attack the form of a transaction, where a third party is involved, and respondent may, as a consequence, find that he is unable to protect himself against the third party's tax treatment of the transaction in accordance with its form. See *Russo v. Commissioner,* 68 T.C. 135, 143–144 (1977). But while such difficulties should cause us to proceed with caution in such situations (see *Penn-Dixie Steel Corp. v. Commissioner,* 69 T.C. 837, 842 (1978)), they do not necessarily preclude the application of the "strong proof" rule and a consequent holding in the taxpayer's favor. *Coven v. Commissioner, supra; Cooney v. Commissioner, supra.* See *Schmitz v. Commissioner, supra* at 318.[13] Re-

---

[11]Cf. *Crenshaw v. United States,* 450 F.2d 472 (5th Cir. 1971).

[12]This rationale also distinguishes *Champlin v. Commissioner,* n. 10 *supra,* upon which respondent also relies.

[13]Compare *Estate of Bette v. Commissioner,* T.C. Memo. 1977–404, and *Renard v. Commissioner,* T.C. Memo. 1972–244.

spondent has the means available to protect himself against being "whipsawed." See *Coven v. Commissioner, supra* at 308 n. 11; *Cooney v. Commissioner, supra* at 107; cf. *Freeport Transport, Inc. v. Commissioner,* 63 T.C. 107 (1974).

Having reached the conclusion that petitioner was not a partner in the Bielstein partnership, we need not consider petitioner's alternate argument relating to payments to a partner for goodwill under section 736(b)(2)(B).

The next issue for decision is the allocation of $37,177 in legal expenses, incurred by petitioner in connection with his divorce settlement, to the bases of properties received in that settlement. Petitioner received $449,407 in stock, cash, and real estate.

Petitioner acknowledges that, in *United States v. Gilmore,* 372 U.S. 39 (1963), legal fees such as the ones in question were held to be nondeductible. Respondent does not dispute treatment of the legal expenses as capital expenditures rather than noncapitalizable personal expenditures.[14]

Respondent determined that the legal fees should be allocated pro rata among the properties and cash received, in accordance with their relative values. Petitioner argues that none of the expenses should be allocated to the cash, since the effect of such an allocation would be to disallow recovery of a portion of the legal expenses, or that a current deduction should be allowed for the expenses allocable to cash, notwithstanding the Supreme Court's decision in *United States v. Gilmore, supra.*

Although we have been unable to discover any authority which could be considered dispositive of the point, we believe that respondent's allocation of a pro rata portion of the legal expenses to the cash is correct.

As far as the record reveals, petitioner incurred his legal expenses to arrange a settlement of the community property interests of himself and his wife involving both cash and noncash assets.[15] Because cash cannot have a basis in excess of its face value, any expenses, which are attributable to the acquisition of cash but are not deductible, cannot be recovered by the taxpayer. See *California & Hawaiian Sugar Refining Corp. v. United*

---

[14]This issue was expressly left open by the Supreme Court in *United States v. Gilmore,* 372 U.S. 39, 52 (1963), and *United States v. Patrick,* 372 U.S. 53, 57 (1963). The only case which dealt with the issue upheld capitalization and the resulting addition to basis. *Gilmore v. United States,* 245 F. Supp. 383 (N.D. Cal. 1965).

[15]The record herein is totally inadequate to enable us to determine whether the settlement constituted a taxable or nontaxable event and neither party has raised any question in this respect.

*States,* 159 Ct. Cl. 561, 573–574, 311 F.2d 235, 242 (1962). Nor, in our opinion, can the portion of the expenses incurred to obtain the cash properly be considered a cost of acquiring the other assets.[16] The mere fact that petitioner will be denied the tax benefit of some of his expenditures is not a ground for increasing the bases of other properties by costs not properly allocable thereto.[17] Nor is it a reason to allow petitioner a current deduction for expenses not otherwise deductible. Cf. *Iowa Southern Utilities Co. v. Commissioner,* 333 F.2d 382, 385, 387 (8th Cir. 1964), affg. T.C. Memo. 1962–267; *Helvering v. Stormfeltz,* 142 F.2d 982, 985 (8th Cir. 1944), affg. a Memorandum Opinion of this Court; *Kurkjian v. Commissioner,* 65 T.C. 862, 871 (1976); *Kelly v. Commissioner,* 23 T.C. 682, 688 (1955), affd. 228 F.2d 512 (7th Cir. 1956). Our analysis is reinforced by the personal character of the dispute in respect of which the legal expenses were incurred. Cf. *United States v. Gilmore, supra.* See also n. 14 *supra.* In view of the foregoing, we hold that a pro rata portion of petitioner's legal expenses are allocable to the cash he received under the divorce settlement and are, consequently, nondeductible.

*Decision will be entered under Rule 155.*

---

[16]Compare *Meyer v. Commissioner,* T.C. Memo. 1975–349, affd. 547 F.2d 943 (5th Cir. 1977).

[17]We recognize that calling a pro rata share of the legal expenses "costs" of obtaining cash may appear incongruous in view of the rule that the basis of cash cannot exceed its face amount. See V. Brookes, "Litigation Expenses and the Income Tax," 12 Tax L. Rev. 241, 252–253 (1957). However, the appearance of incongruity fades when the legal expenses are considered a charge against the amount of cash, see *Bessenyey v. Commissioner,* 45 T.C. 261, 277 (1965), affd. on another issue 379 F.2d 252 (2d Cir. 1967), so that, in effect, petitioner received an amount of cash net of any expenses incurred to acquire that cash.