ROBERT A. AND JEFFIE LOU HAMMETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hammett v. Commissioner
Docket No. 29254-85.
United States Tax Court
T.C. Memo 1987-205; 1987 Tax Ct. Memo LEXIS 201; 53 T.C.M. (CCH) 636; T.C.M. (RIA) 87205; April 22, 1987. Herbert S. Kendrick and Ray A. Balestri, for the petitioners. William P. Hardeman, for the respondent. WILLIAMS
MEMORANDUM FINDINGS *202 OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax for fraud [1] for the taxable years 1978, 1979 and 1980 as follows: Section 6653(b) [2]
Year
Deficiency
Addition To Tax
1978
16,166.54
9,832.66
1979
8,334.96
4,492.66
1980
2,543.53
2,363.65
The issues we must decide are (1) whether petitioners are entitled to amortize a portion of the purchase price of an insurance agency allocable to a covenant not to compete in excess of $500.00; and (2) whether petitioner Robert A. Hammett is liable for additions to tax for fraud pursuant to section 6653(b) for the taxable years 1978, 1979 and 1980. [3]
FINDINGS OF FACT Some of the facts have *203 been stipulated and are so found. Petitioners, Robert A. Hammett ("petitioner") and Jeffie Lou Hammett, are husband and wife who resided at Dallas, Texas when they filed their petition in this case. Petitioner has an 11th grade education. He operated a gasoline service station in Dallas, Texas from 1950 until 1957. In 1957 petitioner left the service station at the invitation of his friend John H. Rozelle to become an insurance solicitor for Rozelle's insurance agency. In 1960, petitioner left Rozelle's agency to start his own insurance business. Petitioner and Rozelle remained close friends and saw each other several times a week. Early in 1977, Rozelle decided to retire from the insurance business and offered to sell his agency to petitioner. Rozelle's agency was very profitable, earning about $125,000.00 per year with expenses of approximately $30,000.00 to $40,000.00 per year. Rozelle did not try to sell the agency to anyone else because he and petitioner were best friends, and he wanted him to have it. [4] Petitioner agreed to purchase the agency from Rozelle for $200,000.00, paying $50,000.00 up front and $30,000.00 per year for five years. Petitioner had never purchased *204 an insurance agency before. Rozelle had purchased two agencies, and petitioner agreed to let him draft the sales contract. Neither party was represented by counsel in the transaction. Petitioner and Rozelle discussed the contract in general terms. They never went over the contract word for word, and petitioner did not read the contract. Petitioner's primary concern in negotiating with Rozelle was getting guarantees of renewals on some of Rozelle's accounts, and particularly one large account, the Horn Williams Ford dealership owned by Rozelle's brother-in-law. Rozelle agreed to guarantee one renewal on each of his five largest accounts. If any of these accounts were not renewed, the purchase price of the agency would be reduced. Rozelle agreed to stay and work with petitioner for eight months without pay to try to ensure that accounts were renewed. *205 The sales contract included a covenant providing that Rozelle would not compete with petitioner for a period of five years. Petitioner was concerned only with the existence of a covenant not to compete and did not discuss any specific allocation of the purchase price to the covenant. Rozelle allocated $500.00 of the purchase price to the covenant so that he could pay capital gains tax on most of the purchase price. [5]
Petitioner and Rozelle signed the sales contract at the Republic National Bank on April 25, 1977. They chose the bank because it was a neutral ground and because there was a notary public there. Petitioner did not read the contract before signing it. The contract and promissory note were signed in duplicate original. *206 Rozelle received one copy of each. Petitioner received a copy of the promissory note but could not remember ever receiving a copy of the signed contract. Jeff Crowson has operated a bookkeeping and tax service since 1948. He has known petitioner since the late 1950's and was keeping his books when petitioner purchased Rozelle's insurance agency in 1977. Crowson did not advise petitioner on the purchase before it took place and did not see the signed contract until the audit of petitioners' income tax returns began in 1979. Crowson testified that soon after the sale, petitioner asked him under what conditions he could amortize the purchase price. After research Crowson told petitioner that only a covenant not to compete could be amortized. Petitioner told him to amortize the entire purchase price on that basis. [6] On petitioners' income tax returns Crowson amortized $26,672.00 in 1977 because it was not a full year and $40,000.00 in 1978. *207 In November 1979, respondent commenced an audit of petitioners' 1977 and 1978 tax returns. The audit was later expanded to include petitioners' 1979, 1980 and 1981 returns. The amortization deduction arising from the purchase of Rozelle's insurance agency became the principal issue in the audit. Respondent's revenue agent, Flora Salisbury, asked petitioner for the contract or other papers to substantiate his amortization deductions. Petitioner gave her the promissory note that was signed with the sales contract. Petitioner claims to have searched his office and found an unsigned document that he assumed represented his agreement with Rozelle. The terms of this unsigned document are identical to those of the signed contract except that only one of the accounts Rozelle agreed to guarantee, Horn Williams Ford, is listed and no amount is allocated to the covenant not compete. Jim Hendrix, petitioner's friend and at that time the partner in charge of the Dallas office of the accounting firm of Main Hurdman and Cranstoun, was told by petitioner that his contract with Rozelle did not allocate an amount to the covenant not to compete but that he had been depreciating the agency at *208 $40,000.00 per year. Hendrix told him that to avoid an argument over the amount of the deductions, that an amount of the purchase price should be stated as consideration for the covenant. After his conversation with Hendrix in November 1979, petitioner had his secretary type and back date to 1977 a false agreement, the Non-Competitive Agreement, allocating the entire purchase price to the covenant not to compete. He then asked Rozelle to sign it. Rozelle agreed on the condition that petitioner sign a handwritten statement that the signed contract dated April 25, 1977 represented the agreement between the parties and that the Non-Competitive Agreement was of no force and effect. Rozelle and petitioner signed the Non-Competitive Agreement on November 16, 1979. After the Non-Competitive Agreement was signed, petitioner had Crowson carry it to Salisbury along with other books and records she had asked to see. Petitioner testified that he did not ask Rozelle for a copy of the signed contract before preparing the false document because he thought the unsigned document that he had was identical to it. After she received the Non-Competitive Agreement, Salisbury contacted Rozelle. *209 He showed her the signed contract, showing a $500.00 allocation to the covenant not to compete. She then opened an audit of Rozelle's returns, and he gave her the handwritten statement declaring that the Non-Competitive Agreement was not the true agreement between the parties. When Salisbury confronted petitioner, he admitted that the Non-Competitive Agreement was prepared in 1979 and back dated. He did not, however, mention the handwritten statement he had signed. On November 12, 1982, petitioner pleaded guilty to the offense of knowingly making a false statement to the Secretary, a violation of section 7207. The Plea Agreement provides: [7]
PLEA AGREEMENT
In return for Defendant ROBERT A. HAMMETT, also known as R. A. Bud Hammett, entering a plea of guilty to the superseding information filed this day, the government agrees to move for the dismissal of the indictment filed August 5, 1982 in this cause at the conclusion of his sentencing. FACTUAL RESUME
On or about the 16th day of November, 1979, ROBERT A. HAMMETT, also known as R. A. Bud Hammett, defendant, a resident of Dallas, Texas, in a matter within the jurisdiction of a department and agency of the United *210 States, namely an audit of the defendant ROBERT A. HAMMETT's 1977 income tax return by the Internal Revenue Service, did wilfully and knowingly prepare and cause to be prepared, and present and cause to be presented to Flora Salisbury, Revenue Agent for the Internal Revenue Service at 3604 Cedar Springs, Dallas, Texas, a two-page document entitled NON-COMPETITIVE AGREEMENT which set the consideration given by ROBERT A. HAMMETT, defendant and purchaser, to John H. Rozelle, seller, for a five-year non-competitive agreement in conjunction with the 1977 sale of the John H. Rozelle Co. by John H. Rozelle, seller, to ROBERT A. HAMMETT, defendant and purchaser, at $200,000.00 and bore the date May 1, 1977, whereas ROBERT A. HAMMETT, defendant, then and there well knew the consideration mutually agreed upon by ROBERT A. HAMMETT, defendant and purchaser, and John H. Rozelle, seller, in the Bill of Sale and Contract executed on or about April 25, 1977 in the 1977 sale of the John Rozelle Co. by John H. Rozelle, seller, to ROBERT A. HAMMETT, defendant and purchaser, for the seller John H. Rozelle's covenant not to compete for a period of five (5) years was five hundred dollars ($500.00), and *211 the defendant, ROBERT A. HAMMETT, also well knew that the two-page false document previously described as bearing the date May 1, 1977 was in truth and in fact prepared and executed on or about November 16, 1979. Petitioner received a $1,000.00 fine. The unsigned document pertaining to the purchase of Rozelle's agency was typed on *212 8 1/2" X 11" paper. The signed contract is on 8 1/2" X 14" paper. Petitioner did not possess a copy of the signed contract. Petitioner testified that Rozelle gave him the unsigned document and that that was the document he discussed in general terms with Rozelle. Petitioner stated that he did not sign the unsigned document because Rozelle was going to add the names of additional accounts that he would guarantee and type the document in final form. Rozelle first testified that he had never discussed the unsigned contract with petitioner, that he had not prepared a contract on 8 1/2" X 11" paper, that the contract was not typed on his typewriter, and that he did not prepare more than one draft of the contract. Later Rozelle conceded that there may have been more than one draft of the contract and that the unsigned contract could be a draft. Rozelle stated, however, that even if the unsigned contract was a draft of his agreement with petitioner, that it was not the final agreement he entered into with petitioner. We believe that petitioner knew the unsigned document did not represent his agreement with Rozelle. Even if the unsigned document was a draft of the sales agreement *213 that petitioner discussed with Rozelle, petitioner testified that he did not sign it after discussing it with Rozelle because Rozelle was going to retype the contract in final form and add the names of additional accounts to guarantee. Petitioner thus knew that Rozelle was going to prepare a new draft of the contract for signature and that the unsigned document was not the final agreement between the parties. [8]
On June 12, 1980, petitioner hired the accounting firm of Main Hurdman and Cranstoun ("Main Hurdman") to review his tax returns for 1977 and 1978 and to prepare his return for 1979. Petitioner provided the accountants at Main Hurdman with the unsigned *214 document, which made no allocation to the covenant not to compete. He also gave them the Non-Competitive Agreement but told them that there was another document that nullified it. Hendrix instructed petitioner to try to obtain a copy of the signed contract. Petitioner contacted Rozelle but said that Rozelle would not provide him with a copy because petitioner had already gotten him into trouble. Rozelle could not remember petitioner's asking him for a copy of the signed contract. Because Hendrix was unable to locate a copy of the signed contract and because petitioner told him that the unsigned document represented his agreement with Rozelle, Main Hurdman relied on the unsigned document in preparing petitioner's 1979 tax return and in reviewing his tax returns for 1977 and 1978. Main Hurdman reviewed the insurance agency's books and records and determined that an allocation of fifty percent of the sales price, or $100,000.00, to the covenant not to compete was supportable. Petitioner would thus be able to deduct $20,000.00 per year over the five years of the covenant. Petitioner's 1979 tax return showed an amortization deduction of $20,000.00 and stated that petitioner intended *215 to amend his 1977 and 1978 returns to reflect the $20,000.00 per year amortization. The returns were not amended at the time the 1979 return was filed because they were under audit. The accounting firm of Seidman & Seidman prepared petitioner's tax return for 1980. Petitioner apprised Seidman & Seidman in 1981 of all of the facts relating to his purchase of Rozelle's insurance agency, including the existence of a signed contract allocating $500.00 to the covenant not to compete. Seidman & Seidman determined that the $100,000.00 allocation was appropriate despite the allocation in the contract and thus followed Main Hurdman's amortization of $20,000.00 per year. Because $86,672.00 had already been amortized in the three preceding years, however, leaving only $13,328.00 to be amortized over the remaining 28 months, Seidman & Seidman deducted only $5,712.00 for 1980. Seidman & Seidman attached a statement to the 1980 return, disclosing the existence of a signed contract allocating $500.00 to the covenant not to compete but stating that they had determined the $100,000.00 allocation to be proper. The statement also indicates, however, that Seidman & Seidman believed that Main Hurdman *216 was aware of the signed contract allocating only $500.00 to the covenant when it determined that $100,000.00 could properly be allocated. Jeff Crowson prepared petitioner's tax return for 1981. At petitioner's instruction, he deducted a portion of the sale price for Rozelle's agency allocable to the covenant not to compete on the basis of Seidman & Seidman's determination for the previous year. Crowson was aware of the signed contract allocating $500.00 to the covenant not compete when he prepared petitioner's 1981 return. In his notice of deficiency dated April 29, 1985, respondent determined deficiencies in petitioners' income tax and additions to tax for fraud as to petitioner Robert A. Hammett for the taxable years 1977, 1978, 1979, 1980 and 1981. Petitioners timely filed their petition with this Court with respect to the taxable years 1978, 1979 and 1980 on July 25, 1985. Petitioners paid the deficiencies, additions to tax and interest for the taxable years 1977 and 1981 on September 17, 1985. OPINION The first issue we must decide is whether petitioners are entitled to amortize over five years more than $500.00 of the purchase price of Rozelle's insurance agency. *217 Petitioner contends he may allocate more than $500.00 to the covenant not to compete because the $500.00 allocation does not reflect economic reality or the intent of the parties. Respondent argues that the signed contract allocating $500.00 to the covenant not to compete represents the true agreement between the parties and that petitioner is bound by it. A taxpayer who enters into a contract containing a specific allocation and subsequently seeks to change that allocation must present strong proof that the allocation in the contract does not comport with economic reality or the intent of the parties. Sonnleitner v. Commissioner,598 F.2d 464, 467 (5th Cir. 1979); Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72, 81 (1982), affd.    F.2d    (10th Cir. 1984); Major v. Commissioner,76 T.C. 239, 247 (1981). The strong proof standard requires a showing by more than a preponderance of the evidence. Elrod v. Commissioner,87 T.C. 1046, 1066 (1986). [9] Petitioner has not met his burden.
*218 A contractual allocation will be upheld if it has "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. Commissioner,294 F.2d 52, 55 (9th Cir. 1961); Landry v. Commissioner,86 T.C. 1284, 1307 (1986). If an allocation is economically unrealistic, or is not the result of arm's-length dealing between parties with adverse tax concerns, it will be ignored. See Rodman v. Commissioner,542 F.2d 845, 851 (2d Cir. 1976), affg. on this issue a Memorandum Opinion of this Court; Schulz v. Commissioner,supra;Landry v. Commissioner,86 T.C. at 1307-1308. If the contracting parties do not have adverse interests, the strong proof rule does not apply. See Landry v. Commissioner,86 T.C. at 1308. Petitioner has not presented strong proof that the $500.00 allocation to the covenant not to compete did not reflect economic reality or the intent *219 of the parties. Although at first glance $500.00 appears to be a very small amount to allocate to a covenant not to compete in a $200,000.00 sale, looking at the contract as a whole, it was a reasonable allocation representing the intent of both parties. Petitioner and Rozelle discussed the sales agreement only in general terms. Petitioner did not review or read the contract before signing it. Petitioner's primary concern was ensuring that Rozelle would guarantee renewals on some of his large accounts, and particularly his largest account, Horn Williams Ford. Petitioner wanted a covenant in the contract to ensure that Rozelle would not compete with him, but he was not concerned with the specific terms of the covenant. Rozelle was primarily concerned with the tax consequences of the transaction. He knew that the portion of the sales price allocable to a covenant not to compete would be treated as ordinary income to him. Rozelle, as the seller, wanted to allocate as small a part of the sales price to the covenant as possible so that most of his gain from the sale would be capital gain. As purchaser, petitioner's tax interest was adverse to Rozelle's. Nevertheless, petitioner *220 argues, we should disregard the $500.00 allocation because (1) when he signed the contract he was unaware of the allocation to the covenant not to compete and (2) he did not understand its tax consequences. Neither of petitioners' arguments convinces us that we should disregard the allocation. Petitioner alleges that Rozelle inserted the $500.00 allocation without his knowledge after petitioner had agreed to the terms of the unsigned document. We have already found, however, that petitioner knew the unsigned document did not represent his final agreement with Rozelle. Petitioner also claims that he and Rozelle never discussed allocating an amount to the covenant not to compete. Petitioner testified, however, that what concerned him was obtaining the covenant. The amount he was paying for the covenant does not appear to have mattered to him. Petitioner admitted that he did not read the contract before signing it. This behavior confirms to us that the amount of any specific allocation was of no consequence to petitioner. We will not renegotiate his contract for him. See Hamlin's Trust v. Commissioner,209 F.2d 761 (10th Cir. 1954), affg. 19 T.C. 718 (1953). *221 Furthermore, Rozelle testified that he would not have sold his business for $200,000.00 if more of the purchase price had been allocated to the covenant not to compete. Since the net effect of increasing the allocation is to increase the Federal income tax on the gain from the sale, only an increased purchase price would compensate Rozelle for such an increased allocation. We believe that Rozelle would not have concluded the sale at the purchase price bargained for without a specific allocation of $500.00 to the covenant not to compete. Therefore, we believe the contract reflects the intentions of the parties. Petitioner received (1) a profitable business, (2) guaranteed renewals of the five largest accounts, (3) a covenant not to compete and (4) Rozelle's agreement to work with him without pay to help ensure that accounts were renewed. In exchange, Rozelle received the right to treat most of the sales price of the agency as capital gain. Petitioner is, therefore, bound by the terms of the contract and is entitled to amortize only the $500.00 allocable to the covenant over five years. Next we must decide whether petitioner is liable for the additions to tax for fraud for the *222 taxable years 1978, 1979 and 1980 pursuant to section 6653(b). Fraud is a factual question to be resolved by an examination of the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent must establish, by clear and convincing evidence, that petitioner acted with specific intent to evade taxes that he knew or believed he owed. Patton v. Commissioner,799 F.2d 166, 171 (5th Cir. 1986), affg. a Memorandum Opinion of this Court. Fraud is never presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970), but may be proven by circumstantial evidence because direct proof of a taxpayer's intent is rarely available. Marsellus v. Commissioner,544 F.2d 883, 885 (5th Cir. 1977). Petitioner's entire course of conduct must be examined to determine whether the requisite fraudulent intent exists. See Patton v. Commissioner,799 F.2d at 171; Stone v. Commissioner,56 T.C. 213, 223-224 (1971). *223 Courts have relied on a number of indicia of fraud in deciding section 6653(b) cases, and a taxpayer's failure to furnish the government with access to his records is one indicium. Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam a Memorandum Opinion of this Court. In addition, a taxpayer's lack of credibility, inconsistent testimony or evasiveness on the stand are heavily weighted factors in considering the fraud issue. Toussaint v. Commissioner,743 F.2d 309, 312 (5th Cir. 1984), affg. a Memorandum Opinion of this Court. A conviction under section 7207, although it does not conclusively establish fraud, is also a factor indicative of fraud. See United States v. Pomponio,429 U.S. 10 (1976); Wright v. Commissioner,84 T.C. 636, 641-643 (1985). [10] No single factor is necessarily sufficient to establish fraud, but the existence of several factors is persuasive circumstantial evidence. Solomon v. Commissioner,732 F.2d at 1461; Beaver v. Commissioner,55 T.C. at 93. *224 In 1979, in the course of the audit of his 1977 and 1978 income tax returns, revenue agent Salisbury asked petitioner for documentation specifically relating to the covenant not to compete. Petitioner claims to have searched his office and found an unsigned document that did not allocate an amount to the covenant not to compete and that he believed represented his agreement with Rozelle. He did not give the unsigned document to the revenue agent, however. Instead petitioner gave her a false document that he wrote in 1979 and had his secretary back date to 1977, purporting to allocate the entire purchase price to the covenant not to compete. In connection with this document, petitioner plead guilty to violating section 7207. In the Plea Agreement petitioner admitted that he knew in 1979 that his agreement with Rozelle included a $500.00 allocation to the covenant not to compete. Petitioner is collaterally estopped from denying that he knew about the $500.00 allocation in 1979 because that issue has already been determined by a valid and final judgment. Montana v. United States,440 U.S. 147, 153 (1979); Wright v. Commissioner,84 T.C. 636, 639 (1985). *225 There is no evidence of any event between 1977 and 1979 that would have enlightened petitioner about the existence of the allocation. We thus infer that he knew when his 1978 return was prepared that the contract contained a $500.00 allocation to the covenant not to compete. Even if we conclude that he knew about the $500.00 allocation, petitioner contends that we should disregard it because he was not aware of its tax consequences. The record establishes that when he signed his 1978 return, however, he knew the tax consequences of the allocation. Our conclusion is largely based on Crowson's testimony. Crowson testified that petitioner asked him in 1977 how he could deduct the entire purchase price of Rozelle's agency. After Crowson told him that the only basis for the deduction would be an allocation of the entire purchase price to a covenant not to compete, petitioner told Crowson to deduct the purchase price on that basis and that he "would have" a written contract. Petitioner, however, had no contract allocating any more than $500.00 to the covenant not to compete. We, therefore, find that petitioner is liable for the addition to tax for fraud for 1978. In 1980, petitioner *226 hired Main Hurdman to prepare his income tax return for 1979. He provided Hendrix, the partner in charge of Main Hurdman's Dallas office, with the unsigned document and the Non-Competitive Agreement, but told him that there was another document that negated the Non-Competitive Agreement. Main Hurdman thus did not rely on the Non-Competitive Agreement in preparing petitioner's tax return. Hendrix asked petitioner for a signed copy of the sales contract, but petitioner stated that Rozelle would not give him a copy. Because he was unable to determine with certainty that a signed contract allocating a small amount to the covenant not to compete existed, and because petitioner assured him that the unsigned document represented his agreement with Rozelle, Hendrix relied on the unsigned document in preparing petitioner's income tax return for 1979. As we have previously found, petitioner is collaterally estopped from denying that he knew about the $500.00 allocation in 1979. See Montana v. Commissioner,440 U.S. 147, 153 (1979); Wright v. Commissioner,84 T.C. 636, 639 (1985). Consequently, petitioner knew when his 1979 Federal income tax returns were *227 prepared that additional Federal income tax was owing and that the return falsely claimed an amortization deduction to which he was not entitled. Further, as demonstrated by the preparation of the false Non-Competitive Agreement, petitioner attempted to conceal from the Government his true and known Federal income tax liability. Petitioner knowingly caused Main Hurdman to prepare a false income tax return for 1979. Petitioner's conviction under section 7207, although not conclusive evidence of fraudulent intent, is persuasive evidence of fraud when viewed with the rest of petitioner's actions. We, therefore, find that petitioner is liable for the addition to tax for fraud in 1979. As to 1980, we find that petitioner did not act with intent to evade tax and is, therefore, not liable for the addition to tax for fraud. Seidman and Seidman prepared petitioner's income tax return for 1980 and was aware of the signed contract allocating $500.00 to the covenant not to compete. Although Seidman and Seidman concluded that Main Hurdman had properly allocated $100,000.00 to the covenant not to compete and prepared the return on that basis, it attached a statement to the return acknowledging *228 the existence of a contract allocating $500.00 to the covenant not to compete. Petitioner's disclosure on his Federal income tax return of the $500.00 allocation precludes us from finding that petitioner had a specific intent to evade tax when he filed his income tax return for 1980. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioner Jeffie Lou Hammett is not liable for the additions to tax. Her liability is limited to the amount of the deficiency for each year. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
3. Deficiencies in petitioners' Federal income tax and additions to tax for Robert A. Hammett's fraud for 1977 and 1981 were determined but are not at issue.↩
4. Petitioner testified that Rozelle approached other insurance companies about buying his agency but did not think that they were willing to give him the price he wanted. We accept Rozelle's testimony because we believe he knows better than petitioner what actions he took before offering to sell petitioner the business.↩
5. The portion of the sales price of a business allocable to a covenant not to compete is taxable as ordinary income to the seller and is deductible over the life of the covenant by the purchaser. See section 1.167(a)-3, Income Tax Regs.; Lazisky v. Commissioner,72 T.C. 495, 500 (1979), affd. sub nom. on another issue Magnolia Surf, Inc. v. Commissioner,636 F.2d 11↩ (1st Cir. 1980).
6. Petitioner testified that he never instructed Crowson to amortize any part of the purchase price in 1977 or 1978 because he did not know the significance of the covenant not to compete until 1979. We found Crowson to be a credible witness. We do not believe that Crowson would make the decision to amortize without seeing a contract or receiving instructions from petitioner.↩
7. On brief petitioner asks us to rule that the Plea Agreement and Judgment are hearsay, the contents of which were not stipulated by the parties. Petitioner, however, reserved only a relevancy objection in the stipulation which we overruled prior to admitting the stipulation and exhibits, including the Plea Agreement and the Judgment into evidence. As to these documents, petitioner waived any objection other than relevancy when he signed the stipulation of facts. The stipulation provides: The parties hereby stipulate and agree that for the purpose of this case the following facts and exhibits referred to herein and made a part hereof may be taken as true, except as specifically reserved by a party in certain paragraphs, subject to the rights of the parties to introduce other and further evidence not inconsistent with this stipulation.↩
8. The unsigned document lists only one account, Horn Williams Ford, to be guaranteed. Petitioner testified that Rozelle mentioned certain other accounts that he would be willing to guarantee but petitioner was only concerned with Horn Williams Ford because it was a large account and Rozelle's brother-in-law owned the business. Rozelle is an astute businessman, and we cannot believe that he would have unilaterally agreed to guarantee the additional accounts listed in the signed contract without a demand from petitioner.↩
9. Respondent contends that the Fifth Circuit, to which this case is appealable, has adopted the more stringent rule first enunciated by the Third Circuit in Commissioner v. Danielson,378 F.2d 771 (3d Cir.), cert. denied 389 U.S. 858 (1967), and that we must, therefore, apply the Danielson rule. See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In Danielson, the Third Circuit held that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." 378 F.2d at 775. In Spector v. Commissioner,641 F.2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), cert. denied 454 U.S. 868 (1981), the Fifth Circuit adopted the Danielson rule as the appropriate standard to apply under the particular facts of the case. It is unclear whether the Fifth Circuit has abandoned the strong proof rule in cases involving allocations to a covenant not to compete. We note simply that petitioner has not met his burden of proof under the strong proof rule and thus would also fail to satisfy the more stringent Danielson↩ rule.
10. In Wright v. Commissioner,84 T.C. 636 (1985), we held that a conviction under section 7206(1) does not collaterally estop a taxpayer from denying the existence of fraud within the meaning of section 6653(b). Section 7206(1) provides criminal sanctions for any person who knowingly and willfully makes a false statement on a return or other document. We based our decision on the Supreme Court's interpretations of the word "willfully" as used in sections 7201 -- 7207. "Willfully" refers to a "voluntary, intentional violation of a known legal duty," and does not require a specific intent to evade taxes, which is an element of section 6653(b). United States v. Pomponio,429 U.S. 10, 11-13 (1976); see Wright v. Commissioner,84 T.C. at 641-642. Section 7207 provides criminal sanctions for any person who knowingly and willfully delivers a false or fraudulent document to the Secretary. Because the Supreme Court has held that "willfully" has the same meaning in section 7206(1) and section 7207, United States v. Bishop,412 U.S. 346 (1973), we hold that a conviction under section 7207 does not collaterally estop a taxpayer from denying fraud within the meaning of section 6653(b)↩.